## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**LEANNE WRIGHT-PHILLIPS,**

> **Plaintiff,**

> **v.**

**UNITED AIRLINES, INC., MADISON ROE #1, and JOHN DOE #1,**

> **Defendants.**

Civ. No. 20-14609 (KM) (ESK)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Leanne Wright-Phillips suffered an anxiety attack while aboard a United Airlines flight, but the flight attendant refused to supply her with requested oxygen. Then, when the plane landed in Newark, United employees had the New Jersey Port Authority Police detain and question Wright-Phillips for causing a disruption. Wright-Phillips alleges that this was all motivated by her race (she identifies herself as Black), so she brings civil-rights and tort claims against United, the unidentified flight attendant ("Madison Roe"), and the unidentified pilot ("John Doe"). United moves to dismiss the complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). (DE 20.)[1] For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

---

[1]     Certain citations to the record are abbreviated as follows:

DE = docket entry

Am. Compl. = Amended Complaint (DE 19)

Mot. = United's Brief in Support of its Motion to Dismiss (DE 21)

Opp. = Wright-Phillips' Opposition to United's Motion to Dismiss (DE 23)

Reply = United's Reply Brief (DE 24)

## I.   BACKGROUND

### A. Facts

Wright-Phillips frequently flies with United. (Am. Compl. ¶ 18.) Like other flyers, she occasionally suffers from anxiety during air travel. (*Id.* ¶ 19.) Medication usually keeps her anxiety at bay, but sometimes she has trouble breathing and asks for supplemental oxygen. (*Id.* ¶ 22.) Flight crews keep supplemental oxygen on board, and she had never had any problem requesting and receiving it. (*Id.* ¶¶ 22–27.)

Wright-Phillips flew on a United flight from Los Angeles to Newark. (*Id.* ¶ 28.) Turbulence triggered her anxiety, and she began to struggle to breathe, although she had taken medication. (*Id.* ¶ 32.) She rang for a flight attendant, and Roe, a flight attendant who appeared racially white, came to her seat. (*Id.* ¶¶ 33–35.) She told Roe, "I suffer with anxiety on flights at times and I know how it starts, I am struggling to breathe." She asked Roe for supplemental oxygen. (*Id.* ¶ 37.)

Roe became irritated, questioned Wright-Phillips about her anxiety, and then told her that "medical clearance" was necessary to give her oxygen. (*Id.* ¶¶ 38–39.) Wright-Phillips had never heard of this requirement, and had receiving oxygen on previous flights without incident. (*Id.* ¶ 39.) Roe left Wright-Phillips's seat location, and when she did not return for six minutes, Wright-Phillips rang for her again. (*Id.* ¶¶ 41–43.)

When Roe returned, Wright-Phillips asked if medical clearance had been obtained and said that her anxiety was building, so that she needed oxygen right away. (*Id.* ¶ 46.) Roe responded, "I told you I needed to get medical clearance," in a raised voice. (*Id.* ¶ 47.) Wright-Phillips asked Roe if she had tried getting medical clearance, but Roe would not answer. (*Id.* ¶¶ 49–50.)

Roe left again but returned a few minutes later with other attendants. (*Id.* ¶¶ 51–52.) Wright-Phillips told the attendants that she had asked for oxygen. (*Id.* ¶ 55.) Roe loudly stated, "I can't just give you oxygen, I need medical clearance, I told you this." (*Id.* ¶ 57.) Wright-Phillips responded, "but

you are not getting medical clearance, it has been over 15 minutes. Please I just need some air." (*Id.* ¶ 58.) Roe and the other attendants left. (*Id.* ¶ 59.)

Given the time that had elapsed, Wright-Phillips thought she was having a panic attack. (*Id.* ¶ 60.) Then Roe asked, over the announcement system, whether there was a doctor on board. (*Id.* ¶ 61.) This confirmed to Wright-Phillips that Roe had not yet previously attempted to get medical clearance, so Wright-Phillips took additional medication. (*Id.* ¶¶ 62–63.)

Crew members then approached Wright-Phillips with a passenger who was a doctor; Roe was holding an oxygen tank. (*Id.* ¶ 64.) Wright-Phillips told the doctor about her anxiety and that she had just taken more medication. (*Id.* ¶ 65.) The doctor "responded appropriately" and asked her questions. (*Id.* ¶¶ 66–67.) The doctor said "excuse me" to stop Roe from speaking over him. He told Wright-Phillips that she should be fine, but not to drive home. (*Id.* ¶ 68.)

Wright-Phillips then asked Roe to leave her alone for the rest of the flight because Roe had upset her. Roe responded in a raised voice, "Don't you dare speak to me like that, and if you don't stop I will de-board the plane." (*Id.* ¶ 71.) Roe then approached a white passenger, knelt down, put her hand on the passenger's forearm, and asked, "Are you okay after that?" (*Id.* ¶ 74.) Later, during beverage service, Roe only served a white passenger in Wright-Phillips' row; Wright-Phillips was served by a Black attendant. (*Id.* ¶¶ 82–84.)

When the flight landed at Newark Airport, passengers were asked to remain seated. (*Id.* ¶ 86.) The New Jersey Port Authority Police ("PA Police") came aboard and escorted Wright-Phillips off the plane. (*Id.* ¶ 87.) An officer told her that the flight crew had reported her as a "disturbance." (*Id.* ¶ 91.)

Near the gate, in public view, the PA Police detained and questioned Wright-Phillips. (*Id.* ¶ 100.) At one point, a white passenger came up and told the officers that there was no reason for Wright-Phillips to be detained. (*Id.* ¶ 101.) She was released without charge. (*Id.* ¶ 102.) Nonetheless, this ordeal has led to exacerbated anxiety, a diagnosis of panic disorder, panic attacks, and difficulties in her day-to-day ability to function. (*Id.* ¶¶ 207–12.)

### B. Procedural History

Wright-Phillips sued United, Roe, and Doe (the pilot), alleging the following claims: (1) discrimination in air transportation, in violation of 49 U.S.C. § 40127; (2) discrimination in places of public accommodation, in violation of 42 U.S.C. § 2000a; (3) deprivation of civil rights, in violation of 42 U.S.C. § 1983, (4) denial of equal treatment under the law, in violation of 42 U.S.C. § 1981; (5) conspiracy to interfere with civil rights, in violation of 42 U.S.C. § 1985; (6) discrimination in places of public accommodation, in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12(f)(1); (7) false imprisonment; (8) negligent infliction of emotional distress ("NIED"); (9) intentional infliction of emotional distress ("IIED"); (10) negligent training; (11) defamation; and (12) *respondeat superior*. (Am. Compl. ¶¶ 104–272.) United moves to dismiss all claims for failure to state a claim. (Mot.)

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

## III.   DISCUSSION

I discuss each claim individually and hold as follows:

- Count 1 will be dismissed because I hold that there is no implied private right of action to enforce 49 U.S.C. § 40127(a).
- Count 2 will be dismissed because 42 U.S.C. § 2000a(a) can only be enforced by an action for injunctive relief, while Wright-Phillips seeks damages and otherwise lacks standing to seek injunctive relief.
- Count 3 will be dismissed because United is not a state actor.
- Count 5 will be dismissed because there are insufficient allegations of conspiracy.
- Count 7 will be dismissed because Wright-Phillips fails to adequately allege that Roe and Doe instigated her arrest.
- Count 12 will be dismissed because *respondeat superior* is not in itself a claim for relief.

The remaining claims (Counts 4, 6, 8, 9, 10, and 11) survive.

## C. Count 1: 49 U.S.C. § 40127(a)

Wright-Phillips brings a claim under 49 U.S.C. § 40127(a), which provides that "[a]n air carrier . . . may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry." Section 40127(a) thus sets forth a legal obligation but is "silent about whether an individual may bring suit to enforce" that obligation. *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 297 (3d Cir. 2007). In this scenario, I must decide whether Congress impliedly expressed an intent that victims could sue violators of this statute for damages. *Id.* Making that showing is difficult because the Supreme Court stresses that courts should rarely imply private rights of action. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018). Still, the task is not impossible, and I apply a two-part test, derived from *Alexander v. Sandoval*, 532 U.S. 275 (2001), asking whether Congress intended to create (1) a "personal right" and (2) a "private remedy." *Wisniewski*, 510 F.3d at 301.

### 1. Personal Right

"Personal rights inhere in the individual; they are individually focused; they create individual entitlements." *Three Rivers Ctr. for Indep. Living v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 419 (3d Cir. 2004) (quotation marks and citation omitted). To determine whether the statute creates a personal right, I review its text and context. *McGovern v. City of Philadelphia*, 554 F.3d 114, 119 (3d Cir. 2009).

### a. Text

I first review the text for "rights-creating language." *Id.* at 301–02 (citation omitted). To be "rights-creating," language must be worded as an "entitlement[] for the person protected" rather than a "prohibition[] on the person regulated." *Wisniewski*, 510 F.3d at 302 (citation omitted). For example, the phrase "[n]o person shall be subjected to discrimination" is rights-creating because it focuses on the individual—the "person"—who is protected. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002) (alterations and citation omitted). As a counterexample, the phrase "No funds shall be made available to any educational agency or institution which has a prohibited policy" is not rights-creating, because it focuses on the regulated entities (educational agencies and institutions). *Id.*

Section 40127(a) is not worded as a right belonging to passengers. It is worded as prohibition on or regulation of air carriers; it forbids air carriers from discriminating. As a result, it does not create a personal right under the strictest reading of the linguistic "rights-creating" test. Indeed, for this very reason, courts in other circuits have held that § 40127(a) does not create a private right of action. *E.g.*, *Shebley v. United Cont'l Holdings, Inc.*, 357 F. Supp. 3d 684, 691 (N.D. Ill. 2019); *James v. Am. Airlines*, 247 F. Supp. 3d 297, 307 (E.D.N.Y. 2017).

There is, however, a Third Circuit wrinkle. This Circuit does not treat the "rights creating language" test as the be-all-and-end-all. *Wisniewski*, 510 F.3d at 302 n.19. Rather, the Court will look beyond the phrasing, because the

facially apparent "'focus' of a statute might have more to do with Congress's writing style than its intent." *Id.* Accordingly, our Court of Appeals has held that statutes created personal rights even if "phrased in terms of responsibilities imposed on [regulated entities]," when "[t]he plain purpose of these provisions [was] to protect rights afforded to individuals." *Grammar v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 530 (3d Cir. 2009).

Wright-Phillips has a fair argument that § 40127(a) falls into this broadened category, for two reasons. First, dictum from *Wisniewski* provides some suggestive support for her position. When explaining why phrasing should not be dispositive, the *Wisniewski* court queried, rhetorically: "Does the appropriateness of a private right of action depend on whether a statute says 'no person shall be subjected to discrimination in a federally funded program' rather than 'no federally funded program shall discriminate'?" *Wisniewski*, 510 F.3d at 302 n.19 (citation omitted). The question here is parallel: Does "an air carrier may not subject a person to discrimination" really mean anything different from "no person shall be subjected to discrimination by an air carrier?" Here, as in *Wisniewski,* the implied answer is no. Congress's use, or not, of the "passive voice" is not in itself "a reliable guide" to whether it created personal rights. *Id.*

Indeed, the second reason § 40127(a) may create a personal right is the commonsense proposition that antidiscrimination laws are often and conventionally phrased in terms of the entity being regulated. Start with the idea that "[t]he right to be free from discrimination is a personal right." *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974). Next, consider two legal texts enshrining that right: Title VII of the Civil Rights Act and the Equal Protection Clause of the Fourteenth Amendment. The former provides that "[i]t shall be an unlawful employment practice for an employer" to discriminate, 42 U.S.C. § 2000e-2(a)(1), and the latter provides that "[n]o state shall . . . deny to any person . . . the equal protection of the laws," U.S. Const. amend. XIV § 1. Both focus on the entity regulated (the employer or the state),

yet they protect a personal right. *See, e.g., Bowers v. NCAA*, 346 F.3d 402, 420 (3d Cir. 2003) (in "discrimination cases," "the right at issue" is "the right to be free from discrimination"); *Johnson v. California*, 543 U.S. 499, 510 (2005) (Equal Protection Clause enshrines "[t]he right not to be discriminated").[2] The same could be true of § 40127(a); although it is "phrased in terms of responsibilities imposed on" airlines, its "plain purpose . . . is to protect rights afforded to individuals." *Grammar*, 570 F.3d at 530.

The text, then, provides no clear answer as to whether it creates a personal right. I look farther afield.

### b. Context

I next consult the statute's context, including its legislative history. *McGovern*, 554 F.3d at 119. Congress enacted § 40127(a) as part of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR Act"), Pub. L. No. 106-181, § 706, 114 Stat. 61, 157–58 (2000). The AIR Act was an omnibus act, reauthorizing Federal Aviation Administration ("FAA") programs and "address[ing] many of the problems plaguing our aviation system." H.R. Rep. No. 106-167, pt. 1, at 101 (2000). At a high level, then, the AIR Act, which includes § 40127(a), deals more with airline regulation than with civil rights.

Nothing in the legislative history suggests that Congress intended to create a private right of action with § 40127(a), and that silence weighs against an implied cause of action. *Wisniewski*, 510 F.3d at 307–08 (although not dispositive, congressional silence suggests no private right of action was intended). In fact, the legislative history only reveals statements recognizing

---

[2]     These examples are linguistic—*i.e.*, I use them as illustrations of language that confers a personal right. There are, of course, explicit statutory provisions for private rights of action pursuant to Title VII and the Equal Protection Clause, and I do not mean to imply that these examples bear directly on the implication of a private right of action from a silent statute. *See* 42 U.S.C.§§ 2000e-5 (Title VII); 42 U.S.C. § 1983 (providing a private remedy for constitutional violations). The Title VII and Equal Protection Clause examples are merely offered to show that, at a high level, language like that of § 40127(a) is thought sufficient to create personal rights. At least, that interpretation is not ruled out, as it might be by the strict "rights creating language" approach.

that § 40127(a) created a prohibition. *See* H.R. Rep. No. 106-167, pt. 1, at 102 (explaining that with the AIR Act, federal law "[f]or the first time, explicitly prohibits racial discrimination in air travel"); 146 Cong. Rec. H1009 (daily ed. Mar. 15, 2000) (Statement of Rep. Jones) ("I am very happy that this will be the first time that explicitly racial discrimination in air travel will be prohibited. It is a long time coming . . . ."). There are no statements about an enforcement mechanism.

Wright-Phillips says we need to go back further to understand the intent of Congress. (Opp. at 14–16.) Congress first adopted an airline antidiscrimination provision in 1938:

> No air carrier or foreign air carrier shall . . . subject any particular person . . . in air transportation to any unjust discrimination or undue or unreasonable prejudice or disadvantage in any respect whatsoever.

Civil Aeronautics Act of 1938, Pub. L. No. 75-706, § 404(b), 52 Stat. 973, 993. This provision, which I will call § 404, continued with Congress's revamp of aviation regulation two decades later. Federal Aviation Act of 1958, Pub. L. No. 85-726, § 404(b), 72 Stat. 731, 760. While § 404 was in place, the Courts of Appeals assumed or held that it created a private right of action. *Hingson v. Pac. Sw. Airlines*, 743 F.2d 1408, 1412 (9th Cir. 1984); *Smith v. Piedmont Aviation, Inc.*, 567 F.2d 290, 292 (5th Cir. 1978); *Karp v. N. Cent. Air Lines, Inc.*, 583 F.2d 364, 365–66 (7th Cir. 1978); *Nadler v. Allegheny Airlines*, 512 F.2d 527, 537 (D.C. Cir. 1975), *rev'd on other grounds*, 426 U.S. 290 (1976); *Fitzgerald v. Pan Am. World Airways, Inc.*, 229 F.2d 499, 501–02 (2d Cir. 1956). But Congress repealed § 404 in 1978. Airline Deregulation Act of 1978, Pub. L. No. 95-504, § 1601, 92 Stat. 1705, 1745; *see also Hingson*, 743 F.2d at 1411 n.1 (noting repeal). That repeal left federal aviation law without an antidiscrimination provision for 22 years, until the AIR Act was enacted in 2000.

Wright-Phillips argues that, by reintroducing an antidiscrimination provision with the AIR Act, Congress reinstated the private right of action

recognized by judicial consensus under old § 404. (Opp. at 15–18.) There are, however, two flaws in this argument.

First, there is no indication that Congress thought of § 40127(a) as the heir to § 404. For starters, the two provisions are worded quite differently, so it cannot be said that Congress, in any straightforward way, was "reintroducing" § 404 when it enacted § 40127(a). The legislative history contains nothing suggesting that Congress thought it was resurrecting § 404, or even had that earlier statute in mind. Indeed, the only relevant statements in the legislative history signify that Congress thought it was explicitly prohibiting such racial discrimination for the "*first time.*" H.R. Rep. No. 106-167, pt. 1, at 102; 146 Cong. Rec. H1009 (emphasis added). While § 404 and § 40127(a) both generally deal with discrimination, I cannot say that Congress even thought about § 404, let alone reenacted it, when it enacted § 40127(a).

Second, the Supreme Court has cast doubt on the presumption that, when Congress reenacts a statute, it incorporates prior judicial interpretations implying a private cause of action. *Sandoval*, 532 U.S. at 287–88. Rather, that presumption is appropriate only when (1) Congress enacted or reenacted "the verbatim statutory text that courts had previously interpreted to create a private right of action," or (2) the presumption "simply buttressed a conclusion independently supported by the text." *Id.* (quotation marks and citations omitted). Neither circumstance is present here: (1) § 404 and § 40127(a) differ textually, and (2) the text of § 40127(a) is at best open to interpretation as to a private right of action. Moreover, the cases interpreting § 404 relied on a more lenient—but now defunct—test for implying a private right of action. *See Wisniewski*, 510 F.3d at 299 (*Sandoval* "altered" the previous test "virtually beyond recognition"). Because these cases come from a bygone era, they have little force here.

* * *

To bring this tour through text and history to an end, I hold that § 40127(a) does not confer a personal right. It is worded in a way that,

according to the Supreme Court, strongly suggests that it does not. I recognize that the grammar is not dispositive, and that even a passive construction, or one targeting the discriminating entity, may connote a personal right. Still, all indications are that § 40127(a) was an airline regulation, not the conferral of a personal right. I move to the second, "private remedy" factor.

### 2. Private Remedy

In addition, and in the alternative, I find that Congress, in passing § 40127(a), did not intend a private remedy. In this inquiry, the Supreme Court has considered varying factors. *Wisniewski*, 510 F.3d at 303–04. The most salient has often been whether Congress provided other enforcement mechanisms; "[t]he express provision of one method of enforcing a substantive rule," for example, "suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290; *see also Wisniewski*, 510 F.3d at 304–05.

There are substantive enforcement mechanisms here, and those mechanisms do not include a private right of action. Specifically, the Department of Transportation ("DOT") and its constituent agencies possess statutory authority to accept complaints filed by persons alleging § 40127(a) violations; to investigate, compel compliance, and assess civil penalties; and to bring actions in federal court.[3] The Secretary of Transportation has delegated enforcement authority for § 40127(a) to one office in particular: the Office of Aviation Enforcement and Proceedings ("OAEP"). *See* U.S. Dep't of Transp.,

---

[3]     *See* 49 U.S.C. §§ 46101(a)(1)–(4) (allowing persons to file complaints with DOT for violations of "this part or a requirement prescribed under this part," of which § 40127(a) is included, and for DOT to investigate and "issue an order to compel compliance"), 46301(a)(1)(A) ("A person is liable to the United States Government for a civil penalty of not more than $25,000 . . . for violating . . . chapter 401," of which § 40127(a) is included), 46301(a)(5)(B)(v) (limiting penalties to $10,000 for "a violation of section 40127" by an "individual or small business"), 46301(d)(2) ("The Administrator of the [FAA] may impose a civil penalty for a violation of chapter 401 . . . ."), 46106 ("The Secretary of Transportation . . . may bring a civil action against a person in a district court of the United States to enforce this part or a requirement or regulation prescribed . . . ."); *see also, e.g.*, *United Air Lines, Inc. Compliance with 49 U.S.C. §§ 40127, 41310, 41702 and 41712*, No. OST-2003-14194, 2003 WL 25428162 (DOT Nov. 19, 2003) (consent order issued after investigation of alleged § 40127(a) violation).

Passengers Right to Fly Free From Discrimination at 1,
https://www.transportation.gov/sites/dot.gov/files/docs/resources/individual
s/aviation-consumer-protection/295211/passengers-right-fly-free-
discrimination.pdf ("OAEP is responsible for enforcing the statutes that prohibit
unlawful discrimination by airlines . . . . OAEP works with the Department's
Aviation Consumer Protection Division (ACPD), which processes and
investigates . . . civil rights complaints."); *see also* U.S. Dep't of Transp.,
Guidance for Airline Personnel on Non-discrimination in Air Travel at 1,
https://www.transportation.gov/sites/dot.gov/files/docs/resources/individual
s/aviation-consumer-protection/295216/guidance-airline-personnel-non-
discrimination-air-travel.pdf (guidance issued by OAEP to airlines for
compliance with § 40127(a)).

I would perhaps find more persuasive a case in which Congress simply
announced an entitlement but seemingly neglected to consider how it would be
enforced. This is not that case. Congress thought about how this
antidiscrimination provision would be enforced, but did not opt for a private
right of action. This detailed agency enforcement scheme "creates a strong
presumption against implied private rights of action that must be overcome."
*Wisniewski*, 510 F.3d at 305. Wright-Phillips has not pointed to anything to
overcome this presumption. I conclude that Congress did not intend to provide
a private remedy with § 40127(a). *James*, 247 F. Supp. 3d at 307 (concluding
that provisions for government enforcement foreclosed implying a private right
of action for § 40127(a)).

* * *

To sum up, I cannot discern an intent by Congress to confer a personal
right or a private remedy with § 40127(a), and the lack of either would be
dispositive. Count 1 will therefore be dismissed.

### D. Count 2

Wright-Phillips brings a claim under 42 U.S.C. § 2000a(a), which
provides that "[a]ll persons shall be entitled to the full and equal enjoyment of

the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination . . . on the ground of race." Those aggrieved by violations may only bring "a civil action for preventive relief," *i.e.*, injunctive relief. § 2000a-3(a); *see also Newman v. Piggie Park Enters. Inc.*, 390 U.S. 400, 402 (1968). Here, Wright-Phillips only seeks damages (Am. Compl. at 17), and her claim may be dismissed for that reason alone. *Roy v. U-Haul*, Civ. No. 14-2846, 2015 WL 375664, at *3 (D.N.J. Jan. 28, 2015).

She responds that the Court should construe the claim as one seeking injunctive relief. (Opp. at 18–19.) Even construing that argument as a motion to amend, which I do not, I would deny it on grounds of futility, because she lacks standing. To seek injunctive relief, Ms. Wright-Phillips must show that she is either currently suffering an injury or will likely suffer an injury in the future. *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 166 (3d Cir. 2007). "[P]ast exposure to illegal conduct" is not enough. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 233 (3d Cir. 2012) (citation omitted). When it comes to discrimination in public accommodations, a plaintiff must show that she will likely visit the venue again and encounter discrimination, or that she is deterred from visiting the venue due to fear of discrimination. *See Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 480 n.15 (3d Cir. 2018); *Disability Support All. v. Heartwood Enters., Inc.*, 885 F.3d 543, 546 (8th Cir. 2018); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336–37 (11th Cir. 2013).

Wright-Phillips alleges affirmatively that this incident was anomalous (she experienced no difficulty obtaining administration of oxygen on past United flights). She has not alleged that she plans to fly United again, but even if she had, it seems implausible that she would encounter the same flight attendant under the same circumstances. Nor has she alleged plausibly that she has been deterred from flying United, or that the Court could or should fashion relief which would remove the impediment. As a result, she does not

13

have standing to seek an injunction compelling United to comply with § 2000a-3(a).

Count 2 will be dismissed.

### E. Count 3: 42 U.S.C. § 1983

Wright-Phillips brings a claim under 42 U.S.C. § 1983, which provides a remedy when a person "acting under color of state law" deprives another of her constitutional rights. Her theory is that the PA Police, acting pursuant to Roe and Doe's orders, unconstitutionally detained her. (Am. Compl. ¶¶ 138–40.)[4]

Section § 1983 applies only to persons acting under color of state law, *i.e.*, state actors. *Crissman v. Dover Downs Ent. Inc.*, 289 F.3d 231, 238–39 (3d Cir. 2002) (en banc). Nonetheless, a private party can be liable if that party worked with a state actor to deprive the plaintiff of her constitutional rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). But a private person who calls the police, even one who supposedly "orders" an arrest, is not generally considered a joint actor with the police. *See Cruz v. Donnelly*, 727 F.2d 79, 80 (3d Cir. 1984) (per curiam).

For example, in *Cruz*, a store manager called the police about a suspected shoplifter and ordered the officer to strip-search the accused. *Id.* The Third Circuit held that the manager did not act jointly with the police because (1) there was no concerted plan between the officer and the manager, and (2) "police normally do not take orders from private citizens," so the court could assume that the officer's actions, although "suggested" by the manager, were attributable only to the officer. *Id.* at 81; *see also Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 196 (3d Cir. 2005) ("The Supreme Court's language requiring joint action or action in concert suggests that some sort of common purpose or intent must be shown.").

---

[4]   The Amended Complaint is not clear which constitutional rights were deprived, but I assume Wright-Phillips alleges violations of the Fourth Amendment and Equal Protection Clause because she alleges that the detention was unreasonable and based on her race. (Am. Compl. ¶¶ 140–44.)

This case has the same deficiencies as *Cruz*. There is no alleged common plan between United and the PA Police. Roe and Doe only "reported [Wright-Phillips] as a 'disturbance.'" (Am. Compl. ¶ 91.) There is even less joint action than in *Cruz,* because there, the manager and officer jointly interrogated the suspect, while Roe and Doe's involvement ceased once the PA Police arrived. (*See id.* ¶ 100.) Although Wright-Phillips alleges that Roe and Doe "ordered" the arrest (*id.* ¶ 94), there are no factual allegations that they possessed the power to do so, and the same proposition was rejected in *Cruz.* Applying similar principles, multiple courts have held that airline employees who call and aid the police to arrest passengers do not thereby transform themselves into state actors. *See, e.g.*, *Berlin v. JetBlue Airways Corp.*, 436 F. Supp. 3d 550, 562–63 (E.D.N.Y. 2020); *Parver v. Jet Blue Airlines Corp.*, 649 F. App'x 539, 543 (9th Cir. 2016); *Al-Watan v. Am. Airlines, Inc.*, 658 F. Supp. 2d 816, 829 (E.D. Mich. 2009); *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1257–58 (9th Cir. 2008); *cf. Carey v. Cont'l Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir. 1987) (airline employee, who complained of striking airline pilot's presence in terminal and refusal to leave, was not a state actor where police who were summoned to the terminal arrested the pilot). Accordingly, there is no state action here by United employees.

Count 3 will be dismissed.

### F. Count 4: 42 U.S.C. § 1981

Wright-Phillips brings a claim under 42 U.S.C. § 1981(a), which provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens." A § 1981 claim requires Wright-Phillips to plead "(1) that [she] belongs to a racial minority; (2) an intent to discriminate on the basis of race by [United]; and (3) discrimination concerning one or more of the activities enumerated." *Pryor v. NCAA*, 288 F.3d 548, 568 (3d Cir. 2002). More recently, the Supreme Court clarified that the plaintiff also must plead that "but for race, [she] would not have suffered the loss of a legally protected right."

*Comcast Corp. v. Nat'l Ass'n of African-Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).[5] Wright-Phillips adequately alleges these elements. There is no dispute on the first element, so I discuss the second and third.

### 1. Discriminatory Intent

On the second element, a plaintiff "is not required to prove discriminatory intent at the motion to dismiss stage, rather she 'need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of [it].'" *Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 87 (3d Cir. 2019) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009)). Racial discrimination is far from a necessary inference here. There are a few allegations, however, which, taken together, push Wright-Phillips's allegations over the plausibility line.

To start, Roe treated Wright-Phillips dismissively, showed an indifference to her safety, and said "don't you dare speak to me like that." (Am. Compl. ¶¶ 51, 71.) This treatment shows disdain and that Roe saw herself as above Wright-Phillips. The facts—as alleged by Wright-Phillips, of course—reveal nothing that would have warranted this treatment. It is possible to infer, then, that something else was motivating Roe, and that something might have been race. Furthering that inference is the allegation that the doctor called to assist Wright-Phillips "responded appropriately" and had to stop Roe from speaking over him as he ministered to Wright-Phillips. (*Id.* ¶¶ 66–68.) One can infer that Roe's animus towards Wright-Phillips was not shared by others and thus not simply how anyone would respond to the situation. Indeed, another passenger expressed to PA Police that "there was no reason" for Roe's conduct. (*Id.* ¶ 101.)

Moreover, Roe approached a white passenger after the interaction and asked, "are you okay after that?" (*Id.* ¶ 74.) This allegation raises an inference of differential treatment because it shows a contrast in concern for a white passenger (who had not shown any need for such concern) and refusal to serve

---

[5]   There is an implied private right of action to enforce § 1981, *Comcast*, 140 S. Ct. at 1015, and § 1981 reaches private conduct, § 1981(c).

a Black passenger who had a demonstrable need for help. This is a stark contrast with race as the differentiating factor. In the same vein, Roe provided beverage service to a white passenger in Wright-Phillips's row, but not her. (*Id.* ¶¶ 82–84.)

Courts have found similar allegations sufficient to state a § 1981 claim. In *Shebley*, a Black passenger asked for a special seatbelt or booster seat for his child, and the flight attendant claimed that United did not provide them, even though the passenger showed the attendant that the website indicated otherwise. 357 F. Supp. 3d at 688. After a back-and-forth, attendants and the pilot had the Black family leave the plane, claiming that they refused to follow instructions, when the family had so complied and remained polite. *Id.* at 688–89. The court held that, given the family's alleged compliance, there was no basis to remove them, so the court could infer that they instead were "unfairly targeted" due to their race. *Id.* at 692.

Next, in *Mercer v. Southwest Airlines Co.*, a flight attendant told a Black passenger he was over the carry-on limit, even though he was not, and white passengers had larger carry-on items. No. 13-cv-05057, 2014 WL 7206881, at *1 (N.D. Cal. Dec. 18, 2014). The attendant spoke to the passenger in a "rude and dismissive tone," looked at him "with distaste and disdain," and said to him "I'll take care of YOU." *Id.* He was removed from the flight. *Id.* The court held that these allegations stated a claim because they showed that the passenger was unfairly singled out and treated as lesser-than. *Id.* at *6.

Finally, in *James*, a Black passenger notified a flight attendant that a white passenger was banging on her seat. 247 F. Supp. 3d at 304. Flight attendants publicly admonished the Black passenger and threatened to remove her, while saying nothing to the white passenger. *Id.* The court held that this "one-sided handling of the situation" created an inference of bias. *Id.*

From these cases, we can glean a principle that flight attendants' treatment of Black passengers that is unsupported by flight rules, coupled with a dismissive and disdainful attitude, can give rise to an inference of

discriminatory intent. When no reasonable basis for such treatment is apparent, the inference of discrimination is correspondingly stronger. So too here. Based on the allegations, Roe did not have a reasonable basis either to refuse to serve Wright-Phillips or treat her in the manner she did. Moreover, the markedly different interaction with the white passenger indicates that race may be at play. For these reasons, Wright-Phillips has sufficiently alleged discriminatory intent.

### 2. Loss of Rights and Causation

Wright-Phillips must allege that the discrimination occurred with regard to "one or more" of the rights which § 1981 explicitly protects. *Pryor*, 288 F.3d at 568. Further, she must allege that she "suffered the loss of a legally protected right" because of her race. *Comcast*, 140 S. Ct. at 1019. Of § 1981's enumerated rights, two are relevant here.

First, Wright-Phillips's pleading and brief focus on the right to "the full and equal benefit of all laws and proceedings for the security of persons and property." (Am. Compl. ¶¶ 149–51; Opp. 23–24.) Like with her § 1983 claim, her theory is that Roe and Doe acted jointly with the PA Police to detain her for discriminatory reasons. (*Id.*) But the Third Circuit has twice explained in dicta that "only state actors can be sued under the 'full and equal benefit' clause," *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001), because "[t]he state, not the individual, is the sole source of law, and it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law," *Mahone v. Waddle*, 564 F.2d 1018, 1029 (3d Cir. 1977).[6] Although not bound by dicta, I cannot lightly discard it,

---

[6] The statement in *Mahone* is certainly dictum, but it is a closer call with *Brown*.

In *Mahone*, the defendants were all state actors and argued against a broad interpretation of § 1981 or else "section 1981 will give rise to a federal cause of action for every racially motivated private tort." 564 F.2d at 1029. One of the reasons the court rejected their arguments was that the equal benefit clause "implicit[ly]" only applied to state actors, so § 1981 did not cast such a wide net of liability. *Id.* at 1029–30. Because a discussion of private liability was not necessary to rendering judgment on state actors, the statement was dictum. *See Coleman v. Greene*, 845 F.3d 73, 76

especially when, as here, the dicta reflects some consideration by the court. *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 223 (3d Cir. 2019) ("[W]e pay due homage to the Supreme Court's *well-considered* dicta . . . ."); *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007) (statements in dicta demand "respect consistent with their persuasive value"). Indeed, courts in this Circuit continue to apply this principle from *Brown* and *Mahone. Wright v. Reed*, No. 20-cv-02664, 2021 WL 912521, at *3 (E.D. Pa. Mar. 10, 2021); *Moore v. Solanco Sch. Dist.*, 471 F. Supp. 3d 640, 665 (E.D. Pa. 2020). *But see, e.g., Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (en banc) (disagreeing with *Mahone* and holding that state action is not required); *Phillip v. Univ. of Rochester*, 316 F.3d 291, 295 (2d Cir. 2003) (same). Accordingly, because Wright-Phillips has not alleged state action, *see* Section III.C, she cannot state a § 1981 claim based on the equal benefit clause.

But there is a second enumerated right relevant here. Section 1981 allows plaintiffs to sue private parties who deprive them of their right "to make and enforce contracts." *Brown*, 250 F.3d at 797.[7] The phrase "make and enforce contracts" encompasses "performance" and "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

---

(3d Cir. 2017) (dictum is a statement that can be removed without impairing the holding).

    *Brown* is a little tougher. *Brown* involved private defendants, and the plaintiffs raised various theories, including one under the equal benefit clause. 250 F.3d at 799. The court primarily rejected that argument because it was forfeited, but the court also explained that "even if we were to consider them, such 'full and equal benefit' claims would fail in light of a substantial line of authority holding that only state actors can be sued." *Id.* (citing, among other cases, *Mahone*). To that extent, there is reason to regard this analysis of the merits as less than a fully developed holding.

[7]    To be sure, the Amended Complaint does not include a specific allegation regarding this right, nor does Wright-Phillips's brief rely on it. But a plaintiff, particularly one who cites the relevant statute, need not necessarily pinpoint the precise legal theory thereunder, if there are adequate factual allegations and the court can readily discern a claim. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam). Wright-Phillips alleges a § 1981 claim explicitly, and her factual allegations support one theory, albeit not the one she explicitly relies on. That suffices to go forward, without the need for a formal amendment, which would get us to much the same place. *See id.*

§ 1981(b). An airline ticket represents a contract of carriage, in which an airline undertakes to transport the passenger safely and serve the passenger while aboard. *See Shebley*, 357 F. Supp. 3d at 692; *James*, 247 F. Supp. 3d at 305; *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1273 (D. Kan. 2003). When flight attendants refuse to offer a passenger a service that is part of the flight, and do so because of the passenger's race, they impair the performance of the contract and deprive the passenger of its benefits. *See id.* Further, this contract includes the benefit "to be flown in relative comfort," so "subject[ing] [a passenger] to racially motivated hostility" alters that benefit. *James*, 247 F. Supp. 3d at 305.

That is what allegedly happened here. Passengers, as part of their contractual relationship with the airline, expect that airline employees will attend to any health emergencies that arise in-flight. Yet Roe refused to honor that obligation by unreasonably delaying Wright-Phillips's requested oxygen. The Amended Complaint alleges that the refusal was motivated by race, *i.e.*, that a person of another race with a similar complaint would have been treated differently. This means that, crediting her allegations, as I must on a motion to dismiss, Wright-Phillips was deprived of a service provided by her contract with United because of her race. She thus satisfies the third element of a § 1981 claim, as well as the requirement of but-for causation.

* * *

Wright-Phillips has adequately alleged the three elements of a § 1981 claim required by the Third Circuit, as well as the Supreme Court's more recent requirement of but-for causation. United's motion to dismiss Count 4 will be denied.

### G. Count 5: 42 U.S.C. § 1985(3)

Wright-Phillips alleges a claim under 42 U.S.C. § 1985(3), which confers a cause of action when "two or more persons . . . conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws." She alleges two conspiracies: (1) between Roe and Doe to deprive her of the right secured

by 49 U.S.C. § 40217(a), and (2) between Roe, Doe, and the PA Police to detain her. (Am. Compl. ¶¶ 158–60.)

A § 1985(3) claim requires "a conspiracy to deprive [a plaintiff] of his rights," motivated by racial animus. *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 802 (3d Cir. 2010). For conspiracies between private actors, a § 1981 claim has only been recognized when the private actors intended to deprive the victim of "the right to be free from involuntary servitude and the right to interstate travel." *Brown*, 250 F.3d at 805. Nonetheless, conspiracies involving a public actor can implicate the deprivation of other constitutional rights. *Davis v. Samuels*, 962 F.3d 105, 113–14 (3d Cir. 2020).

More importantly, the conspiracy must be "*aimed at*" the right; "its impairment must be a conscious objective of the enterprise." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (cleaned up). That is, "the defendant [must] do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." *Id.* at 276.

Starting with the conspiracy between Roe and Doe, this claim fails for two reasons. First, 49 U.S.C. § 40127 is not one of the rights recognized as a basis for a private conspiracy claim, and, anyway, the subject matter of § 1985(3) is *constitutional* rights. *Brown*, 250 F.3d at 805. Second, even assuming that the Amended Complaint could be construed to invoke the constitutional right to interstate travel, the allegations of conspiracy would be insufficient. The allegations do not show Roe and Doe consciously agreed to deprive Wright-Phillips of her right; there are no factual allegations of Roe and Doe speaking to one another, conferring, or acting in concert. I can perhaps infer that Roe informed Doe of her interaction with Wright-Phillips, and that Doe (as the person with radio contact) acted as a conduit to the PA Police, but those actions still fall short of a conspiratorial unity of purpose to deprive Wright-Phillips of her constitutional rights.

21

Likewise, Wright-Phillips has not alleged facts to show a conspiracy between Roe and Doe, on the one hand, and the PA Police, on the other. All that I can discern from the Amended Complaint is that "the [United] flight crew reported her as a 'disturbance.'" (Am. Compl. ¶ 91.) But simply reporting someone to the police does not evince the type of conscious and purposeful agreement with the police that would be required for a § 1985(3) conspiracy; nor does the officers' response to a complaint, even if the complaint were to turn out to be false, implicate them in a conspiracy.

For these reasons, Count 5 will be dismissed.

## H. Count 6: NJLAD

Wright-Phillips alleges a claim under the NJLAD, which prohibits discrimination in places of public accommodation. N.J. Stat. Ann. § 10:5-12(f)(1). Specifically, the NJLAD makes it unlawful

> [f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof . . . on account of the . . . race . . . of such person.

*Id.* A plaintiff must plead that (1) she is a member of a class protected by the NJLAD, (2) the defendant owns or operates a place of public accommodation, and (3) she was denied equal treatment based on her membership in the protected class. *Islam v. City of Bridgeton*, 804 F. Supp. 2d 190, 200 (D.N.J. 2011). There is no dispute on the first element, so I discuss the second and third.

### 1. Public Accommodation

Wright-Phillips satisfies the second element. "Place of public accommodation" is defined by a non-exhaustive list of examples. N.J. Stat. Ann. § 10:5-5(*l*). That list includes "any public conveyance operated . . . in the air or any stations and terminals thereof." *Id.* "Public conveyance" is not further defined. But, at least in other contexts, New Jersey courts have defined "public conveyance" to mean "the holding out of the vehicle to the general public for

22

carrying passengers for hire." *CSC Ins. Servs. v. Graves*, 679 A.2d 1244, 1248 (N.J. Super. Ct. L. Div. 1996) (citation omitted); *see also State v. Griffin*, 223 A.2d 633, 635 (N.J. Super. Ct. App. Div. 1966). One court has held that a commercial plane meets this definition. *Schneider v. New Amsterdam Cas. Co.*, 92 A.2d 66, 69 (N.J. Super. Ct. App. Div. 1952) (citing *Ziser v. Colonial W. Airways, Inc.*, 162 A. 591 (N.J. 1932) (per curiam)). Likewise, while applying analogous Pennsylvania law, the Third Circuit has held that a plane-for-hire is a public conveyance. *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 361–62 (3d Cir. 2004). Indeed, the NJLAD says "public conveyance operated . . . in the air," which indicates that the public conveyance term encompasses air transportation. *Cf. Nat'l Org. for Women, Essex Cnty. Chapter v. Little League Baseball, Inc.*, 318 A.2d 33, 37 (N.J. Super. Ct. App. Div. 1974) ("public conveyance" in NJLAD includes a "moving situs").

Thus, the United flight represented a place of public accommodation.[8] Further, because the statute extends to "terminals thereof," the United gate at Newark Airport was a place of public accommodation, too. Liability under the NJLAD, however, applies to people, not places. *Ptaszynski v. Uwaneme*, 853 A.2d 288, 296 (N.J. Super. Ct. App. Div. 2004). United owns and operates the plane and leases the space in Newark Airport (Am. Compl. ¶ 172), so United is the "owner" or "lessee" that can be sued. N.J. Stat. Ann. § 10:5-12(f)(1).[9] Roe and Doe are "employee[s]" of United, so they, too, are suable persons under the statute. *Id.* Accordingly, the Amended Complaint pleads the second element of an NJLAD claim.

---

[8]   Again, Wright-Phillips's pleading and brief focus on a different theory, that the terminus of the flight, Newark Airport, is a place of public accommodation. (Opp. at 27–28; Am. Compl. ¶ 169.) But the facts alleged also show that the flight itself is a place of public accommodation, so I may consider that claim. *See* n.7, *supra.*

[9]   United does not argue that there are geographic limits to where the NJLAD, or any of the state-law claims for that matter, can be applied. Nor does United raise a preemption defense. Thus, I do not address those possible limitations.

### 2. **Denial of Equal Treatment**

Next, Wright-Phillips must plead that, to paraphrase the statute, United directly or indirectly refused, withheld from, or denied to her any of the accommodations, advantages, facilities or privileges of her flight or Newark Airport, or otherwise discriminated against her in the furnishing thereof based on her race. N.J. Stat. Ann. § 10:5-12(f)(1). In fewer words, she must plead that "she was denied equal treatment." *Islam*, 804 F. Supp. 3d at 200.

A claim arising from the in-flight incident, as it is alleged in the Amended Complaint, fits within the terms of the statute. As explained with respect to § 1981, the contract of carriage includes an expectation that flight attendants will respond to health emergencies and avoid creating a hostile environment for passengers. *See Turner v. Wong*, 832 A.2d 340, 358–59 (N.J. Super. Ct. App. Div. 2003) (construing the NJLAD and § 1981 similarly). Yet, Roe refused for some time to provide Wright-Phillips with supplemental oxygen, thus refusing or withholding from her an accommodation or facility that allegedly should have been, and indeed was, routinely provided. The reader of the Amended Complaint could plausibly infer that this refusal was racially motivated. Further, Roe allegedly created a hostile environment on-board, and a NJLAD cause of action can be based on "discriminatory behavior . . . if it is outrageous enough to imply a design to discourage an individual's use of that public accommodation on account of her protected status." *Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 431 F. Supp. 3d 518, 531 (D.N.J. 2019) (citing *Turner*, 832 A.2d at 355–56; *Franek v. Tomahawk Lake Resort*, 754 A.2d 1237, 1244 (N.J. Super. Ct. App. Div. 2000)). At least on the facts alleged and construed in Wright-Phillips's favor, Roe created a hostile environment, and her animus lends an inference that she had an invidious reason for not wishing to serve Wright-Phillips. *Cf. James*, 247 F. Supp. 3d at 305 (concluding that flight attendants created a racially hostile environment on-board).

In sum, Wright-Phillips has stated an NJLAD claim, at least based on her in-flight experience.[10] United's motion to dismiss Count 6 will be denied.

## I. Count 7: False Imprisonment

Wright-Phillips brings a claim for false imprisonment, alleging that United "acted in concert" with the PA Police. (Am. Compl. ¶ 184.) The tort of false imprisonment requires (1) a "detention of the person against his or her will" and (2) "lack of proper legal authority or legal justification." *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1117 (N.J. 2009) (quotation marks and citation omitted). Before I can reach those elements, however, I must decide if the defendants here can be liable.

There is little in the way of New Jersey law regarding when a party besides the one who actually detained the plaintiff can be liable. Wright-Phillips points to *Di Giovanni v. Pessel*, where the Appellate Division adopted the Second Restatement's position that "[o]ne who instigates or participates in the unlawful confinement of another is subject to liability to the other for false imprisonment." 250 A.2d 756, 770 (N.J. Super. Ct. App. Div. 1969) (quoting Restatement (Second) of Torts § 45A cmt. b (Am. Law. Inst. 1965)). But the New Jersey Supreme Court affirmed in part and reversed in part, while only addressing unrelated issues. 260 A.2d 510 (N.J. 1970). So the precedential value of the Appellate Division's adoption is unclear.

---

[10]    It is a closer question with respect to the events at Newark Airport. Wright-Phillips's theory is that United ordered her detention and arrest by PA Police once the plane landed, and that the experience of being arrested denied her "the advantages . . . to be free from racial discrimination" in a public place. (Opp. at 28; see also Am. Compl. ¶ 175.) Because the PA Police, not United, were the ones allegedly denying her those advantages, I presume she seeks to hold United liable under some joint action or aiding and abetting theory. I am denying the motion to dismiss Count 6 in any event, so the scope of the theory can be fleshed out further in discovery.

Moreover, because both United and its employees are named as defendants, and because United has not attempted to draw distinctions as to who can be liable for what, I will not undertake to address whether vicarious liability principles would defeat any sub-theories of the NJLAD claim. *See Yucis v. Sears Outlet Stores, LLC*, 813 F. App'x 780, 787 (3d Cir. 2020) (concluding that the New Jersey Supreme Court would apply its multi-prong vicarious liability test for NJLAD cases involving harassment in a place of public accommodations).

Still, in the absence of on-point case law, federal courts can predict with some confidence that the New Jersey Supreme Court would follow the Restatement. *See Failla v. City of Passaic*, 146 F.3d 149, 157–58 (3d Cir. 1999). The Second Restatement provides as follows:

> Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself . . . . It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

Restatement (Second) of Torts § 45A cmt. c. The more recent draft of the Third Restatement clarifies that "[i]nstigation occurs when a secondary actor knowingly and substantially directs, requests, invites, or incites" the imprisonment. Restatement (Third) of Torts: Intentional Torts to Persons § 10 cmt. h TD (2018).

As explained, the Amended Complaint falls short of this standard, which echoes the standard for joint action under § 1983. Roe and Doe only gave information to the PA Police about Wright-Phillips and accused of her being a disturbance. That is not enough under either Restatement to implicate them in false imprisonment as such, and indeed they had no authority to direct an arrest, which remained within the discretion and authority of the police.

Nor is it adequately alleged that the police had any knowledge of the allegedly false basis for Roe's accusation of creating a disturbance on the plane. Such a complaint, even if it turns out to be false or misleading, may furnish a probable-cause basis for an arrest, and an arrest on probable cause is not actionable as "false imprisonment." *Mesgleski v. Oraboni*, 748 A.2d 1130, 1139 (N.J. Super. Ct. App. Div. 2000) (probable cause defeats false-imprisonment claim).

Count 7 will be dismissed.

## J. Count 8: Negligent Infliction of Emotional Distress

Wright-Phillips brings an NIED claim based on both (1) the denial of supplemental oxygen while on-board and (2) Roe and Doe's alleged instigation

of her arrest by the PA Police. (Am. Compl. ¶ 225.) An NIED claim requires that "(1) a duty of reasonable care was owed by the defendant to the plaintiff, (2) that duty was breached, (3) the plaintiff suffered severe emotional distress, and (4) the breach was a proximate cause of injury." *G.D. v. Kenny*, 984 A.2d 921, 933 (N.J. Super. Ct. App. Div. 2009) (quotation marks and citation omitted), *aff'd*, 15 A.3d 300 (N.J. 2011).

### 1. Duty

The Amended Complaint adequately alleges a duty of care. Airlines, as common carriers, owe passengers a duty, namely "the highest possible care consistent with the nature of the undertaking," including a "high degree of care for [a] passenger's safety." *Ricci v. Am. Airlines*, 544 A.2d 428, 430 (N.J. Super. Ct. App. Div. 1988) (quotation marks and citation omitted). New Jersey has imposed an additional duty on airline employees "to treat their passengers courteously and respectfully"—to maintain the friendly skies, as United's old advertisement would have it. *Ricci*, 544 A.2d at 432. In the NIED context, the duty element has an additional requirement: That the defendant could foresee that his actions would cause "fright or shock severe enough to cause substantial injury in a person normally constituted." *Gupta v. Asha Enters., L.L.C.*, 27 A.3d 953, 961 (N.J. Super. Ct. App. Div. 2011) (citation omitted).

For plaintiff's first theory, Wright-Phillips informed Roe that she suffered from anxiety attacks and required supplemental oxygen. (Am. Compl. ¶ 37.) That information gave rise to a duty to help her because carriers are liable with respect to known dangers to passengers. *Maison v. N.J. Transit Corp.*, --- A.3d ---, ---, No. 083484, 2021 WL 608269, at *16 (N.J. Feb. 17, 2021). Moreover, it is readily foreseeable that a person who suffers from anxiety attacks and requires supplemental oxygen would undergo a state of fright or shock if deprived of supplemental oxygen. Roe thus had a duty to Wright-Phillips, not to act as a medical professional, but to reasonably accommodate Wright-Phillips's anxiety problem.

27

Wright-Phillips' second theory appears to be a novel one under New Jersey law, yet the parties have hardly addressed it. Treading new ground myself, I start with the proposition that a carrier's duty can include the duty to protect passengers from injuries caused by others and, in some circumstances, to reasonably exercise control over third persons. *Id.* at *12; *Ricci*, 544 A.2d at 431–32. Airline employees exercise some influence over airport police, in the limited sense that they can call upon them to handle passengers. It is reasonably foreseeable that detention by police can create emotional stress, particularly in a person already known to suffer from anxiety.[11]

Suffice it to say that it is reasonably foreseeable to flight attendants that calling the police on a passenger can lead to emotional stress, so they must exercise that power with care. Thus, Wright-Phillips has alleged a duty in connection with her second theory.

### 2. Breach

Next, a breach occurs if the defendant's actions fall below the applicable standard of care. *See Fortugno Realty Co. v. Schiavone-Bonomo Corp.*, 189 A.2d 7, 13 (1963); *Buchner v. Erie R. Co.*, 111 A.2d 257, 260 (N.J. 1955).

As to the first theory, Roe repeatedly refused to provide Wright-Phillips with supplemental oxygen, even though, according to the Amended Complaint, her proffered reason (the prerequisite of "medical clearance") was incorrect. Such a delay in providing oxygen, on the facts as alleged in the Amended Complaint, could be found to be a breach of Roe's duty to care for Wright-Phillips's safety.

As to the second theory, Wright-Phillips alleges that she was not causing a disturbance, so it was unreasonable for Roe and Doe to call the PA Police. On this point, an instructive case is *Ricci,* which dates from the old days when

---

[11]     An arrest or encounter with the police may not, in the ordinary case, give rise to extraordinary emotional distress. That "ordinary case," however, presumes that the citizen is not being subjected to racial discrimination and is not peculiarly susceptible to emotional damage. That said, the facts as alleged do not suggest that the police acted excessively improperly, even assuming that they acted mistakenly, based on allegedly incorrect information reported to them by Roe.

planes had smoking sections for passengers. There, the plaintiff smoked, prompting a physical attack from a fellow passenger. 544 A.2d at 433. Nonetheless, the flight attendant admonished not the attacker but only the smoking plaintiff (who was within his rights as then understood), and threatened to call the FBI to meet the smoker upon landing. *Id.* After concluding that the attendant had a duty to treat passengers courteously and respectfully, the Appellate Division held that it was a jury issue whether the attendant breached that duty because she did not have a proper basis for her threatened call to the FBI. *Id.*

Wright-Phillips similarly alleges that Roe and Doe did not have a reasonable basis for calling the PA Police. Accepting that allegation as true, that means that Roe and Doe could be found to have fallen below the proper standard of care, negligently or intentionally. Of course, discovery may reveal a different story, or a juror could find that calling the PA Police was an appropriate response, but that is an issue for later. At this juncture, Wright-Phillips has adequately alleged the element of breach.

### 3. Severe Emotional Distress

Wright-Phillips must "demonstrate that the defendant's negligent conduct placed [her] in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in a substantial bodily injury or sickness." *Jablonowska v. Suther*, 948 A.2d 610, 618 (N.J. 2008). The Appellate Division has construed "sickness" to mean "a mental condition of a type which may be generally recognized and diagnosed by clinicians." *See Aly v. Garcia*, 754 A.2d 1232, 1237 (N.J. Super. Ct. App. Div. 2000); *see also Clark v. Nenna*, 244 A.3d 291, 295 (N.J. Super. Ct. App. Div. 2020).

Wright-Phillips's first theory satisfies this element. Roe's refusal of supplemental oxygen put Wright-Phillips in fear of immediate bodily injury; she felt that she was unable to breathe without it and was having an anxiety attack. (Am. Compl. ¶ 37.) That ordeal has allegedly led to exacerbated anxiety, a diagnosis of panic disorder, panic attacks, and difficulties in her day-to-day

ability to function. (*Id.* ¶¶ 207–12.) These are mental conditions substantial enough to be clinically diagnosed and require treatment, and hence may satisfy the severity requirement. *See Aly*, 754 A.2d at 1237.

Her second theory, however, stumbles on this element. Wright-Phillips has not alleged that Roe and Doe's negligent conduct in calling the PA Police put her in fear of immediate personal injury. It is possible that one could experience such a fear during a police encounter, *see United States v. Knights*, --- F.3d ---, ---, No. 19-10083, 2021 WL 908278, at *13–14 (11th Cir. Mar. 10, 2021) (Rosenbaum, J., concurring in the judgment) (collecting research); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 415 (S.D. Miss. 2020) (collecting examples), but she has not alleged that. Nor can I make such an inference because, although I do not discount the potentially traumatizing nature of her alleged detention, the facts do not suggest any excessive conduct by the PA Police. As a result, Wright-Phillips's second NIED theory fails.

### 4. Proximate Cause

Finally, proximate cause involves "the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff reasonably flowed from the defendant's breach of duty." *Clohesy v. Food Circus Supermarkets*, 694 A.2d 1017, 1021 (N.J. 1997) (citation omitted). Proximate cause is usually a factual issue for the jury. *Scafidi v. Seiler*, 574 A.2d 398, 402 (N.J. 1990). There is nothing in the Amended Complaint to suggest that her panic disorder and related symptoms were caused by anything but her ordeal, so Wright-Phillips has sufficiently alleged proximate cause.

* * *

In sum, Wright-Phillips has adequately alleged an NIED claim, at least on her theory relating to her in-flight experience. United's motion to dismiss Count 8 will be denied.

### K. Intentional Infliction of Emotional Distress

Wright-Phillips brings an IIED claim, raising the same two theories as with her NIED claim. (Am. Compl. ¶ 227). An IIED plaintiff must show

30

"(1) intentional conduct; (2) the conduct was extreme and outrageous; (3) the conduct proximately caused plaintiff's emotional distress; and (4) the emotional distress was severe." *DeAngelis v. Hill*, 847 A.2d 1261, 1272 (N.J. 2004). The third and fourth elements are essentially the same as with an NIED claim, *see Innes v. Marzano-Lesnevich*, 87 A.3d 775, 797 (N.J. Super. Ct. App. Div. 2014), so I focus on the first and second elements.

### 1. Intentional

On the first element, the "[d]efendant must intend both to do the act and to produce emotional distress" or the defendant must "act[] recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." *Ingraham v. Ortho-McNeil Pharm.*, 25 A.3d 1191, 1195 (N.J. Super. Ct. App. Div. 2011) (quotation marks and citation omitted).

Wright-Phillips's first theory satisfies this element. Roe acted volitionally in denying supplemental oxygen. Moreover, she knew it was requested for the purpose of ameliorating an anxiety attack, and it is alleged that the Wright-Phillip's fragile emotional state was readily apparent. Emotional distress was the natural and probable outcome, so intent "can be inferred." *Taylor*, 706 A.2d at 696. Here, Wright-Phillips has adequately alleged the intent element.[12]

### 2. Extreme Conduct

Wright-Phillips must plead not only that Roe's actions were intentional/reckless, but that those actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and

---

[12]     As in the case of NIED, Wright Phillips's second theory, *i.e.*, that Roe and Doe intentionally inflicted emotional distress by calling the police, is more problematic. It is less clearly inferable that Roe or Doe intended that the actions of the PA police, whatever they turned out to be, would inflict emotional distress. *Cf. Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 224 (E.D.N.Y. 2010) (airline employee's false reporting of passenger for making a bomb threat sufficed because, although "[g]enerally false allegations of providing false information to the police do not suffice," "as an airline employee in post–9/11 America, [defendant] knew or should have known that her false accusations would, at the very least, likely subject [plaintiff] to extensive police interrogation and potentially serious criminal charges" (cleaned up)).

Here, too, however, I am sustaining the count based on the first theory, so its additional scope, if any, can be explored in discovery.

to be regarded as atrocious, and utterly intolerable in a civilized community." *Taylor*, 706 A.2d at 694 (citation omitted). Sometimes, the test has been articulated, dramatically if not very precisely, as whether an average person would hear the facts and "exclaim, 'Outrageous!'" *49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc.*, 547 A.2d 1134, 1145 (N.J. Super. Ct. App. Div. 1988) (citation omitted).

In deciding whether conduct rises to this level, the New Jersey Supreme Court has considered two factors that are relevant here.

First, the court has considered whether the "[d]efendant occupied a position of authority and power over [the] plaintiff," as the "[d]efendant's abuse of this relationship" will support a finding that the defendant's conduct was extreme. *Taylor*, 706 A.2d at 696 (citation omitted); *accord* Restatement (Second) of Torts § 46 cmt. e ("The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.").

Second, the court has suggested that discriminatory conduct is more likely to be considered outrageous. *See Taylor*, 706 A.2d at 695. In *Taylor*, the court held that a single racial slur uttered by an employee's supervisor could be extreme conduct. *Id.* The court cited the State's interest in eradicating discrimination and the idea that "[r]acial insults are different qualitatively because they conjure up the entire history of racial discrimination." *Id.* (citation omitted). To be sure, the court was careful to couch its holding with the additional factors that the slur used was extreme and came from someone in a position of power. *Id.* So, while discriminatory conduct alone will not be sufficient, it is a plus factor, especially on a motion to dismiss. *See Gibbs v. Massey*, Civ. No. 07-3604, 2009 WL 838138, at *9 (D.N.J. Mar. 26, 2009) (courts skeptical of a plaintiff's pleading regarding extreme conduct still often permit the claim to go forward and be developed); *Ingraham*, 25 A.3d at 1197 (noting that extreme conduct has been found when "characterized by

32

outrageous acts otherwise prohibited by the LAD and other anti-discrimination laws"); *Flizack v. Good News Home for Women, Inc.*, 787 A.2d 228, 235 (N.J. Super. Ct. App. Div. 2001) ("The racial and sexual character of [defendant's] comment, coupled with her highly inappropriate sexual misbehavior, might reasonably be found by a jury to be so egregious as to be actionable.").

Wright-Phillips's first theory sufficiently pleads extreme conduct. Three factors, taken together, support this conclusion. First, the conduct here was the denial of supplemental oxygen to someone pleading that she could not breathe. A juror could conclude that refusing someone medical help, and thereby risking her safety, is "intolerable in a civilized community." *Taylor*, 706 A.2d at 694 (citation omitted). Next, compounding this is the fact that Roe was in position of power over Wright-Phillips. An airline passenger is in some sense a prisoner; she cannot provide for her own needs. Roe was the main person Wright-Phillips could turn to for help—yet Roe refused. That was an abuse of Roe's position. Finally, Wright-Phillips alleges that Roe was motivated by racial animus. That allegation makes Roe's conduct more egregious, as a juror could conclude that this incident occurred for a reason our society has deemed repugnant. Thus, Wright-Phillips may proceed on her first theory.

* * *

Wright-Phillips adequately alleges an IIED claim, at least based on her first theory. United's motion to dismiss Count 9 will be denied.

## L. Count 10: Negligent Training

Wright-Phillips brings a negligent training claim, alleging that United negligently trained (1) Roe on procedures for supplying passengers with supplemental oxygen and (2) Roe and Doe on applicable laws governing the equal treatment of passengers. (Am. Compl. ¶¶ 237, 240.) United only devotes one sentence of argument to this claim, asserting that it is too conclusory (Mot. at 34; Reply at 14), so I likewise will be short.

For a negligent training claim, "the plaintiff must prove that (1) an employer knew or had reason to know that the failure to . . . train an employee

33

in a certain way would create a risk of harm and (2) that risk of harm materializes and causes the plaintiff's damages." *G.A.-H. v. K.G.G.*, 210 A.3d 907, 916 (N.J. 2019). An airline surely knows that sometimes supplemental oxygen is needed on flights. (*See* Am. Compl. ¶ 25 ("[S]upplemental oxygen is required to be carried on-board aircraft during air travel for first aid purposes.").) It follows that an airline knows it needs to train flight crews on how to provide supplemental oxygen to avoid medical emergencies.

Roe failed to promptly provide oxygen, which by itself might not suggest negligent training. Her basis for doing so, however, was an alleged policy prohibiting the administration of oxygen without prior "medical clearance." Wright-Phillips has not had the benefit of discovery but reasonably pleads that this was not in fact the airline's policy, because she had received oxygen when request on prior flights. Thus, there is a plausible (though surely not inescapable) inference that Roe was not properly trained on supplemental oxygen procedures. This suffices to state a negligent training claim. *See Estate of Kekona v. Alaska Airlines, Inc.*, No. C18-0116, 2018 WL 1317826, at *3 (W.D. Wash. Mar. 14, 2018) (negligent training of flight crew can be inferred by their actions); *Adler v. WestJet Airlines, Ltd.*, 31 F. Supp. 3d 1381, 1388 (S.D. Fla. 2014) (negligent training claim stated when plaintiffs alleged that flight staff wrongfully ejected them for having a service dog and this resulted from the airline's failure to train its personnel regarding their legal obligations to accommodate service dogs).

Because this theory suffices and United does not discuss the second specifically, I do not reach it. United's motion to dismiss Count 10 will be denied.

### M. Count 11: Defamation

Wright-Phillips brings a defamation claim, alleging that Roe and Doe's accusations to the PA Police about her conduct were false. (Am. Compl. ¶ 248.) United—again—devotes little argument to this claim, instead retreating to the high ground of *Twombly*. (Mot. at 35; Reply at 14.)

A defamation claim requires "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; [] (3) fault amounting at least to negligence by the publisher," and (4) damages. *DeAngelis*, 847 A.2d at 1267–68 (citation omitted).

On the first element, "[a] statement falsely attributing criminality to an individual is defamatory as a matter of law." *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011). Although Wright-Phillips does not allege the precise statements made by Roe and Doe to the PA Police, I can infer that Roe and Doe must have made some accusation of criminal behavior because that is why someone calls the police. *See Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011) ("[A] defamation pleading does not need to cite precise defamatory statements, it must only provide sufficient notice to the other party of the allegations made against him."). Indeed, as Wright-Phillips points out, informing law enforcement that a passenger is a disturbance raises the risk that a person could be detained on suspicion of violating 49 U.S.C. § 46504, which makes it a crime to "interfere[] with the performance of the duties" of a flight attendant by "assaulting or intimidating" an attendant. Further, Wright-Phillips alleges that she was not disruptive, so any suggestion to the PA Police that she was acting criminally or in a way that violated FAA regulations was false. (Am. Compl. ¶¶ 249–50.) These allegations are sufficient to show a defamatory statement. *See Mangan*, 834 F. Supp. 2d at 205 (alleged statements that plaintiff engaged in "financial improprieties" or "cooked the books" when he contended he had not done so).

Next, Wright-Phillips must allege "the unprivileged publication of that statement to a third party." *DeAngelis*, 847 A.2d at 1267–68. This simply means that the statement was "communicated to a person or persons other than the plaintiff." *Feggans v. Billington*, 677 A.2d 771, 775 (N.J. Super. Ct. App. Div. 1996). A communication from Roe and Doe to the PA Police is such a statement.

United has not raised any privilege defense. True, in New Jersey, "citizens have a qualified privilege to make statements to authorities for the prevention and detection of crime." *Dairy Stores, Inc. v. Sentinel Publ'g Co.*, 516 A.2d 220, 226 (N.J. 1986); *see also Moreau v. Walgreen Co.*, 387 F. App'x 202, 204 (3d Cir. 2010). But "a statement is not privileged if the person making it has full knowledge of its untruthfulness." *Geyer v. Faiella*, 652 A.2d 1245, 1248 (N.J. Super. Ct. App. Div. 1995). As explained, I must accept Wright-Phillips's allegation that whatever was said to the PA Police could not have been truthful because she had done nothing wrong. Thus, Roe and Doe would have had knowledge of their accusation's untruthfulness, and no privilege applies.[13]

Third, United does not contend that anyone involved is a public figure or that the matter is one of public concern, so Wright-Phillips need only plead that Roe and Doe "communicat[ed] the false statement while acting negligently in failing to ascertain the truth or falsity of the statement before communicating it." *Feggans*, 677 A.2d at 775. She alleges that they intentionally made the false accusations, so the fault element is satisfied.

Finally, when the defendant makes a spoken accusation of a crime, a jury can presume damages. *W.J.A. v. D.A.*, 43 A.3d 1148, 1154 (N.J. 2012) (per curiam). The damages element is satisfied.

Thus, Wright-Phillips has adequately alleged the elements of a defamation claim. United's motion to dismiss Count 11 will be denied.

### N. Count 12: *Respondeat Superior*

Wright-Phillips purports to state a claim for *respondeat superior*. *Respondeat superior* is not an independent cause of action, but a doctrine for imposing liability on the employer of a person who has committed some tort. *Powell v. Verizon*, Civ. No. 19-8418, 2019 WL 4597575, at *13 (D.N.J. Sept. 20,

---

[13]     To be sure, when it comes to Doe, all I can tell from the Amended Complaint is that he acted pursuant to what Roe told him. So he may lack the knowledge or intent necessary for a defamation claim. But United does not attempt to distinguish between Roe and Doe, so neither do I.

2019) (citations omitted). "*Respondeat superior* is not in itself, then, a 'claim upon which relief may be granted.'" *Id.* (quoting Fed. R. Civ. P. 12(b)(6)).

This is not to say that *respondeat superior* will not apply in this case. Neither the pleading nor the parties' briefs have yet attempted to differentiate the liabilities of the three defendants. Moreover, *respondeat superior* and other vicarious liability principles may apply differently to different claims, so we will need to sort out who can be liable for what.

For now, I merely observe that a *respondeat superior* count does not set forth a claim and is superfluous. Count 12 will be dismissed.

### O. Punitive Damages

As a final matter, United notes that the Amended Complaint's prayer for relief seeks punitive damages, so United proceeds to argue for dismissal of the request for punitive damages on each of the claims. (Mot. at 36–39.) I will not reach this argument insofar as it is asserted with respect to claims that are adequately alleged. As Judge Chesler has explained, "the 'plausibility' pleading regime addresses the types of facts a plaintiff must allege to make out a cause of action, not the types of damages the alleged cause of action may eventually warrant." *Jones v. Francis*, Civ. No. 13-04562, 2013 WL 5603848, at *2 (D.N.J. Oct. 11, 2013). As such, "once a civil complaint shows a claim to be 'facially plausible,' nothing in Rule 8 or its judicial gloss suggests, let alone requires, that this Court scrutinize the damages requested by plaintiff as redress for that claim." *Id.* (citation omitted); *see also In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 2875, 2020 WL 8970347, at *11 (D.N.J. Mar. 12, 2020) (adopting position); *Zodda v. Nat'l Union Fire Ins. Co. of Pittsburgh*, Civ. No. 13-7738, 2014 WL 1577694, at *6 (D.N.J. Apr. 12, 2014) (same).

I have found that Wright-Phillips states six claims. This case will thus proceed, and we are a long way off from consideration of damages. Moreover, the availability, or not, of punitive damages will turn on the evidence produced. *Jones*, 2013 WL 5603848, at *2. Except perhaps in the rare, clear case of a

particular form of damages being unavailable, it is too early to rule on such questions at the motion to dismiss stage.

United's motion to dismiss any requests in the Amended Complaint for punitive damages will therefore be denied.

## IV.    CONCLUSION

For the reasons set forth above, the motion to dismiss is granted in part and denied in part. Counts 1, 2, 3, 5, 7, and 12 will be dismissed. The remaining claims (Counts 4, 6, 8, 9, 10, and 11) survive.

A separate order will issue.

Dated: April 1, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**